935 F.2d 1324
 290 U.S.App.D.C. 205, 67 A.F.T.R.2d
91-1139, 60 USLW 2005,
91-2 USTC P 50,305
 Lenora B. FULANI, Dr., et al., Appellants,
v.
Nicholas F. BRADY, Secretary of the Treasury, Fred T.
Goldberg, Commissioner of Internal Revenue and
Commission on Presidential Debates.
 No. 90-5063.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 18, 1991.
Decided June 14, 1991.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 88-02649).
 Arthur R. Block, New York City, for appellants.
 Teresa E. McLaughlin, Atty. Dept. of Justice, with whom Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Robert S. Pomerance, Attys., Dept. of Justice, and Jay B. Stephens, U.S. Atty., were on the brief, Washington, D.C., for federal appellees Nicholas F. Brady, Secretary of Treasury, and Fred T. Goldberg, C.I.R.
 Lee Levine, with whom Harold E. Masback, III, and Lewis K. Loss were on the brief, Washington, D.C., for appellee Com'n on Presidential Debates.
 Before MIKVA, Chief Judge, SENTELLE and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 Dissenting Opinion filed by Chief Judge MIKVA.
 SENTELLE, Circuit Judge:
 
 
 1
 Appellant Lenora Fulani brought this action against the Internal Revenue Service ("IRS") challenging the tax-exempt status of the Commission for Presidential Debates ("CPD"), the sponsor of the 1988 presidential debates. Fulani alleges that the CPD did not meet the qualifications for tax-exempt status under Internal Revenue Code Sec. 501(c)(3) because it presented a partisan political viewpoint by excluding her from the presidential debates. Upon review, we agree with the District Court's conclusion that Fulani lacks standing to challenge the tax-exempt status of the CPD. For this reason, we affirm the District Court's decision to dismiss this complaint for lack of standing.
 
 I. BACKGROUND
 
 2
 In 1987, the League of Women Voters withdrew its traditional sponsorship of the presidential debates, leaving the field open for new sponsors. The Democratic National Committee and Republican National Committee worked together to fill this gap, and eventually incorporated the CPD for purposes of sponsoring the debates. The CPD applied for, and received, tax-exempt status under Internal Revenue Code Sec. 501(c)(3) as an educational organization "which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. Sec. 501(c)(3) (1988). In addition to the benefit of being exempt from taxation, the CPD's Sec. 501(c)(3) status allows it to receive charitable contributions that are tax deductible to the donor. See I.R.C. Secs. 170(a)(1), (c)(2)(D). Perhaps more importantly, this status also qualified the CPD to sponsor candidate debates under Federal Election Commission Rule 11 C.F.R. Sec. 110.13(a)(1). Fulani attacks the CPD's tax-exempt status based on its exclusion of her from its presidential debates.
 
 
 3
 In 1988, Dr. Fulani was a minor-party candidate running as the presidential nominee of the New Alliance Party. Her name was included on the ballot in all fifty states, as well as the District of Columbia, and she qualified for Federal Election Commission presidential primary matching funds. When Fulani learned that the CPD would be sponsoring the presidential debates, she contacted the CPD, inquiring about the process for applying to participate in those debates.
 
 
 4
 The CPD responded to Fulani's request by stating that its policy was to invite "any candidate with a realistic chance of being elected to the Presidency or Vice-Presidency, whatever that candidate's party-affiliation."." The CPD determined the realistic nature of a candidate's chances by examining, inter alia, that candidate's ballot listings; professional opinions of the media, campaign managers, and political scientists; column inches of news coverage; and findings of national pollsters. Applying these criteria, the CPD concluded that Fulani did not have a realistic chance of being elected President of the United States in 1988 and, accordingly, that she would not be invited to participate in the 1988 presidential debates.
 
 
 5
 Fulani brought this action against the IRS in the District Court, seeking to require the IRS to revoke the CPD's tax-exempt status under Sec. 501(c)(3) and assess the taxes due once that tax-exempt status was revoked. She filed separate motions seeking temporary restraining orders or preliminary injunctions, either enjoining the debates from going forward, or requiring the CPD to include Fulani in the debates. The District Court denied these motions, citing the "public interest in allowing the presidential debates to go forward and in preserving an orderly political process." Order Denying Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction (D.D.C. Sept. 23, 1988). The District Court later dismissed Fulani's other claims, on the grounds that Fulani lacked standing to challenge the tax-exempt status of a third party such as the CPD. Memorandum Opinion and Order (D.D.C. Feb. 2, 1990) 729 F.Supp. 158. Appellant then filed the present appeal.
 
 II. DISCUSSION
 
 6
 Before a claimant may request this Court to decide the merits of a dispute, the claimant must establish that she has the requisite standing to bring such a claim. As the Supreme Court has defined it, a claimant establishes standing only if she alleges a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (citation omitted). In the present case, Fulani contends that she is injured by the fact that the CPD is engaging in a program of political misinformation, perpetuating bipartisan, rather than non partisan, political debates. This program, she argues, advocates and perpetuates a two-party system, giving the false impression that there are only two legitimate candidates for presidential office. According to Fulani, this misinformation program directly injured her by depriving her of the media coverage and political legitimacy necessary to her campaign. Moreover, this program violates Sec. 501(c)(3)'s mandate that tax-exempt educational organizations not engage in partisan political activities. Therefore, Fulani alleges that the IRS is responsible for her injury because it indirectly subsidized the CPD by according it Sec. 501(c)(3) tax-exempt status. Thus, Fulani argues, the CPD's tax-exempt status is the cause of her injury, and that injury would be redressed were that status revoked.[1]
 
 
 7
 Accordingly, Fulani seeks to require the IRS to revoke the tax-exempt status of a third party, the CPD. This claim brings to mind Justice Stewart's concurring opinion in Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), stating that he could not "imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else." Id. at 46, 96 S.Ct. at 1928 (Stewart, J., concurring).[2] While Justice Stewart's separate concurrence does not, of course, constitute binding precedent, we have noted previously that it "dramatically denotes the special problems attendant upon the establishment of standing in ... tax cases," when a litigant seeks to attack the tax exemption of a third party. American Soc'y of Travel Agents, Inc. v. Blumenthal, 566 F.2d 145, 150 n. 3 (D.C.Cir.1977), cert. denied, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978); see also Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 145 n. 90 (D.C.Cir.1977).
 
 
 8
 Indeed, the statutory scheme created by Congress is inconsistent with, if not preclusive of, third party litigation of tax-exempt status. Specifically, 26 U.S.C. Sec. 7428 (1988) provides for the "[c]reation of [a] remedy" in the case of an "actual controversy involving--
 
 
 9
 (1) A determination by the Secretary--
 
 
 10
 (A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3)."
 
 
 11
 Significantly, Sec. 7428 specifically limits the remedy it creates by the requirement that "[a] pleading may be filed under this section only by the organization the qualification or classification of which is at issue." 26 U.S.C. Sec. 7428(b)(1).
 
 
 12
 While the cited statute does not preclude expressly the possibility that a third party could file an action under some statute or source of law other than Sec. 7428, it certainly is telling that Congress thought it necessary to create a specific remedy for the adjudication of a Sec. 503(c)(3) determination even on behalf of the one entity whose standing is least subject to challenge, and that Congress chose to limit the remedy to that entity. Therefore, in light of prior judicial pronouncements, such as those quoted above, and apparent congressional intent, if we were to find that a case does exist in which one party can litigate properly the tax exemption of another, it would have to be something far removed from the norm.
 
 
 13
 Fulani, however, hardly acknowledges the existence of the judicial dicta and statutory scheme against her, but seeks to ground her claim in an application of "competitor standing" theory, an application not recognized previously in this Circuit. Under Fulani's proposed application of competitor standing, we should recognize her right to challenge tax benefits that the CPD used to benefit her competitors. Unquestionably, there is such a concept as "competitor standing." That standing has been recognized in circumstances where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage. See, e.g., Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (data processing agency had standing to challenge rulings by the Comptroller of the Currency allowing national banks to enter the data processing field); see also Clarke v. Securities Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (securities brokers had standing to challenge ruling that national banks could act as discount brokers); Investment Co. Inst. v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (open-end investment companies had standing to challenge ruling that banks could deal in collective investment funds).
 
 
 14
 However, this Court specifically has rejected the assertion that "Data Processing should be read to endorse standing for any private business, individual or corporate, which wishes to contest the tax treatment of a competitor." American Soc'y of Travel Agents, 566 F.2d at 151. In the Data Processing line of cases, the government's actions benefitted the plaintiffs' competitors and disadvantaged the plaintiffs. Thus, cessation of the government's actions would redress the plaintiffs' disadvantage by removing the benefit to plaintiffs' competitors. Cf. also Common Cause v. Bolger, 512 F.Supp. 26 (D.D.C.1980)1980) (allowing candidates for public office to challenge statutes establishing franking privileges that benefitted their incumbent competitors). Arguably, if the IRS were depriving Fulani of a benefit that it afforded to others similarly placed, she might be able to challenge that action based on her own tax liability. For example, in Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), the Supreme Court held that a magazine publisher had standing to challenge a state tax exemption available to religious magazines but not to itself, where the publisher argued that this disparate tax treatment was injurious to it and petitioned for a refund of its own taxes. Significantly, the publisher sought to litigate not the competitors' exemption, but its own liability. See also Lawrence v. State Tax Comm'n, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102 (1932) (allowing taxpayer to make equal protection challenge to tax exemption available to competitors); Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959) (same). However, where a party is seeking simply to remove a third party's entitlement to a tax exemption, the exemption likely will not bear sufficient links of traceability and redressability to the alleged injury to warrant standing under Allen v. Wright, supra. See, e.g., Khalaf v. Regan, 55 A.F.T.R.2d 85-647, 1985 WL 392 (D.D.C.1985), aff'd, No. 85-5274 (D.C.Cir. Sept. 19, 1986) (beneficial tax treatment of third party lacked causal link to plaintiffs' alleged harm).
 
 
 15
 The Second Circuit accepted Fulani's theory of competitor standing in the context of a parallel case, Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621 (2d Cir.1989). There, the Second Circuit held that Fulani had standing to challenge the Sec. 501(c)(3) status of the League of Women Voters when the League refused to invite her to participate in the presidential primary debates. The court found that Fulani had suffered a cognizable injury because the League's exclusion of appellant "palpably impaired Fulani's ability to compete on an equal footing with other significant presidential candidates." 882 F.2d at 626. According to the Second Circuit:
 
 
 16
 In this era of modern telecommunications, who could doubt the powerful beneficial effect that mass media exposure can have today on the candidacy of a significant aspirant seeking national political office. The debates sponsored by the League were broadcast on national television, watched by millions of Americans, and widely covered by the media. It is beyond dispute that participation in these debates bestowed on the candidates who appeared in them some competitive advantage over their non-participating peers.
 
 
 17
 Id. (citation omitted). The Second Circuit characterized this injury as "the partisan restriction of her opportunities to communicate her political ideas to the voting public at large." Id. at 627.
 
 
 18
 The Second Circuit went on to find that this injury was "fairly traceable" to the IRS's award of a Sec. 501(c)(3) tax exemption to the League. Under the regulations of the Federal Election Commission ("FEC"), only a non-profit corporation exempt from taxation under Sec. 501(c)(3) may sponsor a nonpartisan electoral debate, unless the corporation is a media organization. 11 C.F.R. Sec. 110.13(a)(1) & (2). Thus, in League of Women Voters, as in this case, Fulani argued that revocation of the League's tax-exempt status would disable it from holding debates between the Republican and Democratic presidential candidates. The Second Circuit accepted this argument, concluding that Fulani's alleged injury was fairly traceable to the IRS's grant of Sec. 501(c)(3) status to the League "[i]n light of the fact that 501(c)(3) status is in practice a prerequisite to League sponsorship of candidate debates under FEC regulations." 882 F.2d at 628. Thus, the Second Circuit granted Fulani standing to challenge the League's tax-exempt status because "[b]ut for the government's refusal to revoke the League's tax-exempt status, ... the League, as a practical matter, would have been unable to sponsor the allegedly partisan debates which caused the injury of which Fulani complains." Id. (emphasis in original). Given but-for causation, the Second Circuit concluded that redressability necessarily followed, "since, practically speaking, revocation of the League's tax-exempt status at least would have prevented the League's sponsorship of the debates, from which Fulani claims she was wrongfully excluded." Id. at 628.
 
 
 19
 By taking the FEC regulation as a given, however, the Second Circuit ignores the fact that the alleged traceability and redressability may be found in League of Women Voters--and could be found in the present case--only in combination with significant intervening causal factors. It is true that CPD's tax-exempt status is a cause-in-fact of appellant's injury; were it not for that status, the CPD would be unable to sponsor the debates under existing FEC regulations. However, the FEC's regulation is an intervening cause--were it not for the regulation, the CPD's tax status would be relevant to its sponsorship of the debates only insofar as it facilitated the CPD's funding through tax-exempt funds. Thus, Fulani's claim would be addressed more appropriately under the FEC's regulation than through the Internal Revenue Code. See 11 C.F.R. Sec. 111.4(a) (providing complaint process for "[a]ny person who believes that a violation of any statute or regulation over which the Commission has jurisdiction has occurred or is about to occur.").
 
 
 20
 Moreover, even assuming the FEC continues to adhere to its present regulations, the CPD remains an intervening causal agent. Were we to order revocation of the CPD's tax-exempt status, the CPD might decline to sponsor presidential debates altogether. This would remove the allegedly unfair advantage to Fulani's competitors, but would prevent Fulani from receiving the same benefit. Or the CPD could choose to include Fulani within the debates in order to retain its tax-exempt status, in which case the two major-party candidates might decline to participate in debates that do not present them as the two salient candidates, thus depriving the debates of the media appeal that Fulani seeks. See Fulani v. League of Women Voters, 882 F.2d at 632 (Cardamone, J., concurring). Thus, while the IRS's decision to provide the CPD with tax-exempt status is a cause of Fulani's claimed injury, it is merely one in a chain of independent causal factors necessary to achieve this injury. Cf. Tax Analysts & Advocates, 566 F.2d at 144 ("Every decision by a government agency generates consequences and various forms of impact on a wide range of valid interests held by a diverse range of parties."). Moreover, given the number of causal factors significant to Fulani's alleged injury, we find that the claim lacks sufficient redressability to warrant standing under the Supreme Court's test in Allen v. Wright, supra.
 
 
 21
 The Supreme Court has emphasized that "Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Simon, 426 U.S. at 41-42, 96 S.Ct. at 1926. The Court also has made clear that an injury will not be "fairly traceable" to the defendant's challenged conduct nor "redressable" where the injury depends not only on that conduct, but on independent intervening or additional causal factors. For example, in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court held that low to moderate income minority residents lacked standing to challenge the city's zoning ordinance. The Court assumed "that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield." 422 U.S. at 504, 95 S.Ct. at 2208. However, the Court found that the plaintiffs had not shown that individuals in Penfield would have sold their properties to the plaintiffs absent the ordinance. The Court rejected the plaintiffs' argument that enforcement of the ordinance against third parties precluded construction of low and moderate income housing. 422 U.S. at 504, 95 S.Ct. at 2208. The Court noted that, although "[t]he fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing," it may "make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." 422 U.S. at 504-05, 95 S.Ct. at 2208.
 
 
 22
 Similarly, in Allen v. Wright, the Supreme Court held that parents of black public schoolchildren had no standing to challenge IRS regulations governing the tax-exempt status of private schools. According to the parents, private schools that engaged in racially discriminatory practices were able to achieve tax-exempt status under these regulations. This advantage, the parents alleged, made it possible for those schools to draw white students out of the public school system, leaving disproportionately black public schools, thus perpetuating segregation throughout the school system and preventing schoolchildren from receiving a public education in a non-discriminatory environment. The Court found that this alleged injury lacked both traceability and redressability, as it was "entirely speculative" to assume that the withdrawal of private schools' tax-exempt status would alleviate this system-wide discrimination. Allen v. Wright, 468 U.S. at 758, 104 S.Ct. at 3328. Assuming that the Court required the IRS to make the change proposed by plaintiffs, it was still impossible to say whether the schools affected by the regulation would change their policies or their financial structures. Even more speculative was the question of whether either change by the private school would result in a decision by a parent to transfer the child to public school. Id. Given these intervening causal factors, the Court found that the parents lacked standing to challenge regulations directed toward third-party private schools.
 
 
 23
 The Court had reached a similar conclusion in the earlier case of Simon v. Eastern Kentucky Welfare Rights Organization, supra. In that case, indigent individuals and organizations representing indigents challenged an IRS Revenue Ruling that decreased the treatment-of-indigent-patient requirements for hospitals maintaining tax-exempt status under Sec. 501(c)(3). The plaintiffs argued that this Ruling caused them injury by decreasing the standard of care available to indigent patients. The Court held that this alleged injury lacked traceability and redressability because of the intervening causal factors. The Court called it "purely speculative" to conclude that the Ruling encouraged poor treatment by the hospitals of indigents, and "equally speculative" to conclude that the hospitals' treatment of indigent patients would improve with the revocation of the Ruling. Simon, 426 U.S. at 42-43, 96 S.Ct. at 1926. Rather than improving treatment programs for indigent patients, hospitals could discontinue such programs altogether and become profit-funded, rather than charitable, institutions. Id. at 45-46, 96 S.Ct. at 1927-28.
 
 
 24
 In the present case, the CPD does not have the option of abandoning its tax-exempt status; the CPD may sponsor the presidential debates only if it receives tax-exempt status from the IRS and is therefore not free, as were the hospitals in Simon, to continue its activities as a profit-funded organization. However, the problem in this case is the same as in Simon: the presence of intervening factors that influence both traceability and redressability. Were the FEC to change its regulations, revocation of the CPD's tax-exempt status could have virtually no effect on the CPD's debate activities. Moreover, as discussed supra, the CPD itself could engage in a variety of activities ranging from declining to sponsor the debate to restricting the debates in such a manner that Fulani still would be unable to attain the level and quality of media exposure she seeks.
 
 
 25
 In the past, this Court has denied standing where "the plaintiff seeks to change the defendant's behavior only as a means to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury." Common Cause v. Dep't of Energy, 702 F.2d 245, 251 (D.C.Cir.1983) (emphasis in original) (consumer organization lacked standing to seek injunction directing government to develop energy conservation plan where court found suit was "merely designed to leverage third-party fuel suppliers into making pricing and allocation decisions favorable to the consuming public"). Here, Fulani is challenging the actions of the IRS only as a means of affecting the behavior of the CPD. The IRS's actions caused her alleged injury only due to other intervening causal factors, including the FEC's regulations, the CPD's actions, and the anticipated behavior of other debate participants. Thus, the redressability of Fulani's injury depends on those factors as well. Because these factors are not before the Court at this time, we find that Fulani's injury does not bear sufficient traceability to the IRS's grant of tax-exempt status to the CPD, nor does the requested relief redress her alleged injury sufficiently to warrant standing in this Court under the test articulated by the Supreme Court in Allen v. Wright.
 
 III. CONCLUSION
 
 26
 We conclude that Fulani's alleged injury fairly cannot be traced to the IRS's grant of tax-exempt status to the CPD, but is instead dependent on the intervening actions of both the FEC and the CPD. For this reason, we hold that Fulani's claim does not warrant standing under the Supreme Court's test in Allen v. Wright. Because Fulani lacks standing to challenge the CPD's tax-exempt status, the decision of the District Court in this case is therefore
 
 
 27
 Affirmed.
 
 MIKVA, Chief Judge, dissenting:
 
 28
 The law of standing deserves no prizes for clarity, nor for certainty. But ambiguity in controlling precedents does not excuse the majority's three-fold departure from them. First, the majority pays only lip service to the injury alleged by the appellants, ignoring the Supreme Court's command to base standing analysis on the allegations actually made by a party seeking judicial redress. Second, it misreads seminal decisions in the standing area, adopting a constricted reading inconsistent with judicial practice. And third, the majority spins out a novel theory of redressability that, if taken seriously, would send legitimate suitors away from federal courts in droves. I dissent.
 
 I.
 
 29
 Under Federal Election Commission ("FEC") regulations, only media organizations and non-partisan, tax-exempt organizations may stage debates between candidates for federal office. See 11 C.F.R. Sec. 110.13 (1991). With this in mind, the Democratic and Republican National Committees orchestrated establishment of the Commission on Presidential Debates (the "Commission"), a private, non-profit corporation dedicated to sponsoring and publicizing debates between contenders for the Presidency and Vice-Presidency of the United States.
 
 
 30
 Dr. Lenora Fulani, a candidate for President in the 1988 election, sought inclusion in debates sponsored by the Commission. Her campaign committee informed the Commission that Fulani was constitutionally eligible to serve as President, that she "fully expect[ed] to be listed on the general election ballots of all 50 states" (as in fact she was), and that she had qualified for federal primary matching funds. Letter from Gary Sinawski to Frank J. Fahrenkopf, Jr. and Paul G. Kirk, Jr. (Aug. 5, 1988). After exchanges of correspondence, the Commission denied Fulani's request, citing its policy of inviting only candidates "with a realistic chance of being elected" to the Presidency or Vice-Presidency, whatever their party affiliation. Letter from Janet H. Brown to Gary Sinawski (Sept. 19, 1988).
 
 
 31
 Dr. Fulani, her campaign organization, and a supporter (collectively, "Fulani") then filed suit against the Secretary of the Treasury and the Commissioner of the Internal Revenue Service ("IRS"), seeking relief including an order requiring the defendants to revoke the Commission's tax exemption under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. Sec. 501(c)(3) (1988). They alleged that the federal defendants' failure to revoke the Commission's tax exemption constituted unconstitutional discrimination against Fulani based on her race and political affiliation. Fulani initially named the Commission as a co-defendant; after the district court declined to order the Commission to include Fulani in its debates, however, Fulani dropped her claims against the Commission. See Fulani v. Brady, 729 F.Supp. 158, 160 & n. 3 (D.D.C.1990).
 
 
 32
 In the 1988 election, Fulani received 0.24 percent of the popular vote. Later, the district court dismissed her claims against the government defendants for want of constitutional standing, finding that Fulani had not satisfactorily alleged injury, causation, or redressability. See id. at 160-65. The district court specifically disagreed with the reasoning of Fulani v. League of Women Voters Education Fund, 882 F.2d 621 (2d Cir.1989), in which the Second Circuit found that Fulani had standing to challenge the tax-exempt status of the sponsor of primary election debates from which she was excluded. This appeal followed.
 
 II.
 
 33
 Fulani's allegations were set out most clearly in an affidavit sworn prior to the 1988 election by Fred Newman, Fulani's campaign manager. Newman averred that Fulani's candidacy "presents the Black community (as well as other disenfranchised population sectors) an historic opportunity to exert power in national politics by becoming a swing vote that can determine the outcome of the election." Moreover, he asserted that the presidential debates "confer legitimacy, credibility, [and] recognition" on candidates and their ideas. Thus:
 
 
 34
 By excluding Dr. Fulani from debates reserved for the major party candidates, the Commission profoundly undermines her credibility with an electorate which has not been equipped to comprehend why she does not appear alongside the other two national presidential candidates on national television. Her absence from these forums casts doubt on her veracity.
 
 
 35
 Verified Statement of Fred Newman (Sept. 19, 1988). Another member of Fulani's campaign organization cast the injury in similar terms: "If [a] debate is held without Dr. Fulani, then people who viewed the debate or heard about it will be even more cautious when our canvassers knock on their doors. The exclusion will have a delegitimizing impact on her candidacy." Verified Statement of Jeffrey Aron (Sept. 19, 1988).
 
 
 36
 For standing purposes, this court must accept each of these allegations as true. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). So taken, Fulani's allegations will support a finding of Article III standing only if they demonstrate "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). When read fairly and in light of guiding precedents, they meet this test.
 
 A. Injury
 
 37
 Although the majority does not dispute the constitutional sufficiency of Fulani's alleged injury, it fails to fully comprehend the nature of this injury, and consequently errs in later aspects of its standing analysis. For this reason, I address the injury question in some detail.
 
 
 38
 Fulani does not assert that she could have won the 1988 election if she had participated in the presidential debates. Instead, she claims 1) that her credibility as a 'spoiler' and public advocate was undermined by the Commission's refusal to invite her, and 2) that allowing then-Vice President Bush and Governor Dukakis to debate alone boosted their campaigns in comparison to hers.
 
 
 39
 It follows from Fulani's allegations that whatever advantage major-party candidates have going into two-candidate presidential debates is exaggerated by the debates themselves, and that such debates disadvantage minor-party candidates. See Johnson v. FCC, 829 F.2d 157, 165 (D.C.Cir.1987) (inclusion of Citizens Party presidential and vice-presidential candidates in televised debates "undoubtedly would have benefited their campaign"); League of Women Voters, 882 F.2d at 626 ("It is beyond dispute that participation in [primary] debates bestowed on the candidates who appeared in them some competitive advantage over their non-participating peers."). This disadvantage constitutes sufficient injury to support a finding of standing. See League of Women Voters, 882 F.2d at 626 ("[T]he loss of competitive advantage flowing from the League's exclusion of Fulani from the national debates constitutes sufficient 'injury' for standing purposes, because such loss palpably impaired Fulani's ability to compete on an equal footing with other significant presidential candidates."); cf. Anderson v. Celebrezze, 460 U.S. 780, 792, 103 S.Ct. 1564, 1571, 75 L.Ed.2d 547 (1983) (cognizable harm of early candidate filing deadline is that "[v]olunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign."); Common Cause v. Bolger, 512 F.Supp. 26, 30 (D.D.C.1980) (three-judge court) (finding challengers for occupied congressional seats injured by franking statute because they will have to spend additional money to "neutralize" campaign advantage of franking privilege), aff'd, 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983).
 
 
 40
 The majority's failure to come to terms with Fulani's injury--so critical to its misapplication of the causation and redressability issues discussed below--is revealed by a baffling reliance on Justice Stewart's concurrence in Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 46, 96 S.Ct. 1917, 1928, 48 L.Ed.2d 450 (1976). See Maj.Op. at 207-208. Dr. Fulani's core allegation is that she will be unlawfully burdened in seeking to make her political message known, while the Democratic and Republican candidates for President would be advantaged in advancing their rival political views. Whatever the merits of Fulani's claim, it suggests restriction of "classically political speech," and so goes to the core of the First Amendment. Boos v. Barry, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988). See Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 186, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979) ("[A]n election campaign is a means of disseminating ideas, as well as attaining political office."). Justice Stewart took pains in his concurrence to distinguish suits that implicate First Amendment rights from other legal claims, confining his skepticism about standing to challenge the tax status of others to cases "outside the First Amendment area." Simon, 426 U.S. at 46, 96 S.Ct. at 1928.
 
 
 41
 Far from supporting the majority's hostility to Fulani's claim, Justice Stewart's concurrence joins the decisions of this and other courts in suggesting that Fulani's allegations are justiciable. Indeed, the majority's contrary claim, see Maj.Op. at 207-208 n. 2, is misguided on two counts. When Justice Stewart suggested the particular justiciability of First Amendment claims, he surely did not have any "exception" pretaining to the religion clauses in mind; no such "exception" existed then, see Doremus v. Board of Educ., 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), and certainly none exists now, see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Perhaps even more disturbing as a general matter is the majority's insistence that Justice Stewart did not mean what he plainly said. Expressive freedom is not so obscure a part of "the First Amendment area" that a Justice of the United States Supreme Court should be presumed to have overlooked it.
 
 B. Traceability
 
 42
 The majority holds that the link between the federal defendants' refusal to revoke the Commission's tax-exempt status and Fulani's political disadvantage is too speculative to make her injury "fairly traceable" to the defendants' failure to act. It correctly notes that FEC regulations and the Commission's role as sponsor of the debates are intervening factors tying the IRS's actions to Fulani's alleged injury. But the majority then goes critically awry by saying that "an injury will not be 'fairly traceable' to the defendant's challenged conduct ... where the injury depends ... on independent intervening or additional causal factors." Maj.Op. at 210. This is not, and has never been, the law.
 
 
 43
 The presence of intervening actors in a chain of events that leads from the alleged legal violation to the alleged harm will not necessarily defeat standing. Warth v. Seldin, 422 U.S. 490, 504-05, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975) ("The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing."). See, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72-78, 98 S.Ct. 2620, 2630-33, 57 L.Ed.2d 595 (1978); United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 688-90, 93 S.Ct. 2405, 2416-17, 37 L.Ed.2d 254 (1973); Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Competitive Enter. Inst. v. National Highway Traffic Safety Admin., 901 F.2d 107, 113-14 (D.C.Cir.1990); Center for Auto Safety v. National Highway Traffic Safety Admin., 793 F.2d 1322, 1334-35 (D.C.Cir.1986). Rather, causation has been found lacking only where "multiple, tenuous links" connect the challenged conduct and the asserted injury. Center for Auto Safety, 793 F.2d at 1335.
 
 
 44
 The paradigmatic case is Allen v. Wright, where the Supreme Court found a chain of causation between the federal tax-exempt status of racially discriminatory private schools and integration of public schools to be "attenuated at best." 468 U.S. at 757, 104 S.Ct. at 3328. The claimed causation in that case involved "numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools) who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education." Id. at 759, 104 S.Ct. at 3329.
 
 
 45
 Establishing a causal nexus between the Commission's tax exemption and Fulani's injury requires no similar guesswork. The Commission's tax exemption enabled it to sponsor presidential debates, see 11 C.F.R. Sec. 110.13, and the Commission had pledged to do so. If those debates went forward as head-to-head affairs, Fulani alleged, the media would focus public attention on the Bush and Dukakis candidacies, thereby setting back her campaign. Only two links in the causal chain between federal tax policy and Fulani's injury are even arguably uncertain: Fulani's claims that 1) barring judicial intervention, the media would cover Bush-Dukakis debates without publicizing Fulani's campaign in an equivalent way, and 2) voters would respond by discounting Fulani's campaign. But media coverage has focused public attention on similar debates at least since 1960, see Commission on National Elections, Electing the President: A Program for Reform 41-43 (April 1986), and this court has already acknowledged that television debates allow candidates who appear in them "to gain publicity and credibility with the citizenry," thereby benefitting their campaigns, see Johnson v. FCC, 829 F.2d at 164, 165.
 
 
 46
 Fulani's claim is similarly distinguishable from that presented in Simon, where the Court determined that it was "purely speculative" whether an IRS ruling concerning treatment of indigent patients had resulted in a denial of hospital services to the poor. 426 U.S. at 42, 96 S.Ct. at 1926. It was perfectly possible, in the Court's view, that hospitals decided whether or not to serve indigent persons "without regard to the tax implications." Id. at 43, 96 S.Ct. at 1926. By contrast, Commission sponsorship of presidential debates depends on the challenged tax exemption; as the majority concedes, the Commission could not lawfully have acted "without regard" to its tax status. Maj.Op. at 210; see League of Women Voters, 882 F.2d at 628 n. 5 (causal nexus alleged by Fulani "far more clearly drawn" than in Simon "because in practice the interlocking frameworks of Internal Revenue Code provisions and FEC regulations severely narrow the League's latitude of discretion").
 
 C. Redressability
 
 47
 The final question with regard to constitutional standing requirements is whether or not there is a "substantial likelihood" that Fulani's injury would be redressed by a favorable decision on the merits. See Duke Power, 438 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20. The majority holds that there is not, arguing that the FEC might change its regulations and that the Commission "might decline to sponsor presidential debates altogether" if faced with alternatives of opening its debates to more candidates or losing its tax exemption. See Maj.Op. at 210, 211.
 
 
 48
 The majority's first concern cannot afford a basis for denying standing. Failing to take legally binding federal regulations as a given when evaluating redressability flies in the face of the Supreme Court's instruction that a party seeking to invoke federal jurisdiction need not negate all "speculative and hypothetical possibilities" that might frustrate the effectiveness of judicial relief. Duke Power Co., 438 U.S. at 78, 98 S.Ct. at 2633. Just as it was not necessary for the plaintiffs in Duke Power to rebut claims about what might have happened had Congress not enacted legislation limiting liability for nuclear accidents, id. at 77-78, 98 S.Ct. at 2632-33, it should not be necessary for Fulani to answer the majority's hypothesizing that the FEC might void regulations that have stood without amendment for more than a decade.
 
 
 49
 Taken to its logical end, moreover, the majority's approach would preclude any suit to force compliance with a statute or administrative regulation. Because Congress or an administrative agency might alter any federal mandate, it is always speculative that legislative or regulatory action will not preempt a judicial declaration of law. For example, a case might be mooted by legislative enactments prior to judgment, or Congress might overturn a particular court decision by statute. However real or ethereal in a given instance, such possibilities have never precluded Article III jurisdiction in the past; they cannot do so now.
 
 
 50
 The majority's speculation about how the Commission might react to a judgment in Fulani's favor is equally misguided. Fulani sued not to attain some "level and quality of media exposure," Maj.Op. at 211, but to avoid the prejudice to her candidacy that would inevitably result from a one-on-one debate between rival candidates Bush and Dukakis. Thus, Fulani's injury would be redressed by any lawful response at all. If the Commission invited Fulani to their debate, and the media covered that event, Fulani's goals would of course be realized. But her political disadvantage would likewise be removed if the Commission included Fulani in a debate ignored by the press or if the Commission decided against holding a debate altogether. Either eventuality would eliminate the unique publicity boost that Bush and Dukakis would otherwise receive from the debate, as well as Fulani's correlative loss of political legitimacy.
 
 D. Prudential Considerations
 
 51
 The majority does not connect its discussion of the statutory scheme surrounding section 501(c)(3) to any aspect of Article III standing. See Maj.Op. at 207-208. This discussion has no relevance to prudential standing considerations either, notwithstanding the majority's implicit suggestion to the contrary. Dr. Fulani and her co-plaintiffs have brought constitutional claims, alleging violations of their own First Amendment rights of free speech and free association, as well as of their Fifth Amendment right to equal treatment regardless of race or political affiliation. See Complaint at 17, 19. Under these circumstances, none of the three prudential limitations on standing identified in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 474-75, 102 S.Ct. 752, 759-60, 70 L.Ed.2d 700 (1982), applies. This is not a case where the plaintiffs assert constitutional rights of others. Nor is Fulani's injury merely a " 'generalized grievance,' pervasively shared." Id. at 475, 102 S.Ct. at 760. Finally, the Supreme Court has suggested that the "zone of interests" test, developed in the context of the Administrative Procedure Act, has no utility in the context of First and Fifth Amendment claims. See Clarke v. Securities Industry Ass'n, 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757 n. 16, 93 L.Ed.2d 757 (1987). The majority has cited no authority, and I am aware of none, suggesting that the court should gauge the justiciability of appellants" constitutional causes of action by looking to statutory enforcement schemes. See Ukrainian-American Bar Ass'n v. Baker, 893 F.2d 1374, 1380 n.* (D.C.Cir.1990) ("Since the UABU asserts only the constitutional right to contact immediate action detainees, and makes no claim under any statute ..., there is no question of prudential standing in this case.").
 
 III.
 
 52
 Since I believe that the appellants have standing to bring their claims, the question of mootness becomes relevant: Is this case moot because the appellants' interest in Commission policies arises solely from Dr. Fulani's candidacy in the 1988 election? Such a defense apparently was not raised before the district court, and it was summarily rejected by the Second Circuit on the analogous facts of League of Women Voters. See 882 F.2d at 628. Although the law on this point is not altogether consistent, I believe that the case is not moot.
 
 
 53
 A case otherwise moot is justiciable when it presents issues "capable of repetition, yet evading review." See Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Outside of the class action context, however, this exception applies only where: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again." Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)) (emphasis added).
 
 
 54
 If literally applied, this rule would prevent courts from hearing election cases after ballots are cast unless the prospective candidates or voters allege that they will seek to run for office or vote the next time around. Nonetheless, we have said without reservation that "[c]ontroversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters 'capable of repetition, yet evading review.' " Branch v. FCC, 824 F.2d 37, 41 n. 2 (D.C.Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Moreover, the Supreme Court and this court often have ignored the same-party requirement in the election context. See Anderson v. Celebrezze, 460 U.S. at 784 n. 3, 103 S.Ct. at 1567 n. 3 (ballot access); Storer v. Brown, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974) (obstacles to independent candidacies); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969) ("one man one vote" context); Johnson v. FCC, 829 F.2d at 159 n. 7 (constitutional and statutory claims that minority candidates have right to appear in televised debates). But see Meyer v. Grant, 486 U.S. 414, 417 n. 2, 108 S.Ct. 1886, 1890, n. 2, 100 L.Ed.2d 425 (1988) (finding same-party requirement satisfied); First Nat'l Bank v. Bellotti, 435 U.S. 765, 774-75, 98 S.Ct. 1407, 1414-15, 55 L.Ed.2d 707 (1978) (same).
 
 
 55
 Justice Scalia has noted a degree of tension between election cases and certain abortion cases, on one hand, and mootness doctrine on the other. See Honig v. Doe, 484 U.S. 305, 335-36, 108 S.Ct. 592, 610-611, 98 L.Ed.2d 686 (1988) (Scalia, J., dissenting); see also Moore v. Ogilvie, 394 U.S. at 819, 89 S.Ct. at 1496 (Stewart, J., dissenting). Yet the law of this circuit, as expressed in Branch v. FCC, compels the conclusion that this dispute is not moot.
 
 IV.
 
 56
 The problems of conducting national elections through the electronic media have become nigh impossible to solve. The "simple" difficulty of reaching voters, the more complicated difficulty of substantively informing them, and the need for huge sums to fund such communications all drive an engine of chaos in the national campaign regimen. Congress and the courts have struggled with this urgent matter, often with frustration. See, e.g., Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). But whatever its proper role in correcting imbalances and imperfections in the status quo, government certainly must not abandon its posture of nonpartisanship. The government of any democracy, let alone one shaped by the values of our Constitution's First Amendment, must avoid tilting the electoral playing field, lest the democracy itself become tarnished.
 
 
 57
 The majority's decision precludes judicial inquiry into allegations that the field has been tilted in favor of the major political parties, and seems to rationalize its result by dismissing Dr. Fulani's candidacy as mere grandstanding. Yet the First Amendment requires government neutrality regardless of candidates' supposed motives. I therefore dissent from a decision that insulates from review federal complicity in keeping minor political parties off the national stage.
 
 
 
 [1]
 Fulani's arguments give rise to questions of mootness; since both the presidential debates and elections are now over, it is arguable that we can provide no legal redress to the parties in the case before us. However, as we find that Fulani's allegations also fall short of establishing standing, we need not address the mootness issue
 
 
 [2]
 The dissent interprets Justice Stewart's statement recognizing a possible exception in the context of the First Amendment as referring to free speech cases. Dissent at 214. This interpretation is unlikely, however, given that there exists--and did exist at the time of Justice Stewart's writing--an actual exception to the general rule against taxpayer standing in cases involving the Establishment Clause and Free Exercise Clause of the First Amendment. See, e.g., Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967). It is therefore logical to interpret Justice Stewart's reference to a First Amendment exception as referring to the Establishment Clause and Free Exercise Clause exceptions that actually existed, rather than to a hypothetical free speech exception