# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2066

_____

Vernon Ashley; Mary Ashley; Beatrice   *
Whiting; Menia Mann; Grace Donner;   *
Gail M. Pomani; Wallace Ashley;   *
James W. Ashley; Joseph A. Ashley;   *
Marice Ashley; Rebecca St. John; Ervin *
Yellow Robe, Jr.; John Howe, Sr.;   *
Shawn St. John; Edward Howe; Rose   *
Howe; Teresa His Law; Dominic   *
Red Water; Guy St. John, Sr.; Neil   *
Howe; Janice Howe; Raynard Howe;   *
Irwin Fire Cloud; Lori Drapeau; Mabel   *    Appeal from the United States
Grey Cloud; Quentin Drapeau; Marlon   *    District Court for the District of
Sitting Crow; Nicole M. Drapeau;   *    South Dakota.
Sarah Drapeau; Shirley Odea; Deanna   *
Eare; Christina Eare; Myron   *
Sitting Crow; Victor Sitting Crow;   *
Darlene Medicine Crow; Marlow   *
Medicine Crow; Doris St. John; Valerie *
Medicine Cedar; Fred Fleury, Jr.; Harry *
Flute; Sandra Flute Harmon; Michael   *
Harmon, Sr.; Raynel Gonzales; Wallace *
Wells; Glenda St. John; Marlin Ross;   *
Raymond Gonzales, Jr.; Richard Taylor; *
Priscilla St. John; Angela Long Crow;   *
Emilee Gibson; Cameron Ross; William *
Shields; Wanda Sazue; Pedro St. John;   *
Madeline Big Eagle; Carl Howe, Sr.;   *
Charlotte Rockwood; Dawn Dubray;   *
Linda Ross; Alfred St. John; Wilfred   *
Keeble; Leonard Marks; June Ashes;   *
Kitty M. Wells; Kymberly Rockwood;   *

Martha Fleury; Jon Bird; Margaret      *
Fleury; Hester Fleury; Lorenzo Fleury;      *
Alan Fleury; James Crowe; Magdaline      *
White Mouse; Patrick Wounded Knee;      *
Ronald Wounded Knee; Carl      *
Medicine Crow; Ernest G. Middletent;      *
Daniel Azure; Chris Gravatt; Kendra      *
Kirkie; Patsy Marquez; Dauna Gravett;      *
Joyce Reed; Becky Taylor; Shannon      *
Shields; Roland St. John; Ron Kirkie;      *
Royce Kirkie; Arlene Voice; Willard      *
Voice; Joseph Shields; Lyle      *
Medicine Crow; Brenda St. John; Mary      *
Lou Boyzo; Glenda Wounded Knee;      *
Eric Thompson; Virgil Crowe;      *
Valentina Merritt; Lester Thompson;      *
Eunice St. John; Daisy Merritt; Hope      *
His Law; James Sazue; George Comes      *
Flying, Jr.; Renita Taylor; Werdna      *
Wounded Knee; Loren Michael Bagola;      *
Feanette Griffith; Mary Morin; Lakes      *
of the Brave, Inc., for themselves and      *
all others similarly situated; Lynette      *
Charging Whirlwind,      *
     *
          Appellants,      *
     *
       v.      *
     *
United States Department of Interior;      *
Gale Norton, Secretary of the Interior;      *
James Steven Griles, Deputy Secretary      *
of the Interior; Government Capital      *
Corporation; Crew & Associates, Inc.,      *
     *
          Appellees.      *

_____

Submitted:  February 14, 2005
Filed: June 1, 2005
_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and GRUENDER, Circuit
Judges.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Vernon Ashley and over one hundred other members of the Crow Creek Sioux Tribe appeal the district court's decision to dismiss their complaint. The district court concluded that the plaintiffs lacked standing because they could not establish an injury in fact and had failed to join an indispensable party. We too hold that the plaintiffs lack standing, but for a different reason: a judgment in their favor is not likely to remedy the harms about which they complain.

I.

Congress created a trust fund for the Crow Creek Sioux Tribe with the Crow Creek Sioux Tribe Infrastructure Development Trust Fund Act of 1996 (the Act). Pub. L. No. 104-223, 110 Stat. 3026 (1996).  The Act obligates the Secretary of the Interior to make periodic payments to the Tribe and requires the Tribe to prepare a plan for use of the payments. *Id.* at §§ 4(d)(2), 5.  Under the Act, the plan must allot money for an educational facility, a health facility, a water system, and other things of like nature, and the Tribe must consult with the Secretaries of the Interior and Health and Human Services when drafting the plan. *Id.* at § 5.

After Congress passed the Act, the Tribe issued bonds to fund land purchases, loan consolidation, and tribal government improvements. The Government Capital Corporation, a private entity, underwrote the bonds, and Crew & Associates, Inc.,

purchased the bonds. As part of the transaction agreement, the Tribe assigned its payments from the trust fund to Crew through the year 2012. Pursuant to a statute in effect at the time, 25 U.S.C. § 81 (1994) (prior to its amendment in 2000), the United States government had to approve the agreement before it went into effect. The government signed off on it, and Crew began receiving its yearly payments.

The plaintiffs filed the complaint in this case, naming government and private parties (but not the Tribe) as defendants. The complaint contains a raft of claims, all of which spring from either 25 U.S.C. § 81, 25 U.S.C. § 464 (which provides that government approval is needed for transfers of certain kinds of Indian property), the Act, or the government's fiduciary duty to the Indian people. The crux of the complaint is that the trust money is not being used (and will not be used) for the purposes laid out in the Act. To remedy this situation, the plaintiffs ask the court to undo the assignment to Crew, rescind the waiver of the Tribe's sovereign immunity that is included in the bond agreement, and instruct the government defendants to ensure that the Tribe spends the money in conformance with the Act.

The defendants filed a motion to dismiss in the district court, arguing, pursuant to Fed. R. Civ. P. 12(b)(1), that the court lacked subject matter jurisdiction, and, pursuant to Fed. R. Civ. P. 12(b)(6), that the plaintiffs had failed to state a claim. The court granted the motion for two reasons. First, the court concluded that it could not exercise jurisdiction over the suit because the plaintiffs lacked standing: They could not establish that they had suffered an injury in fact, the court maintained, because Congress intended the trust payments to benefit the Tribe and not individual members of the Tribe. Second, it held that dismissal was appropriate because the plaintiffs had failed to join an indispensable party, *see* Fed. R. Civ. P. 12(b)(7), 19, namely, the Tribe. The plaintiffs appealed.

II.

On appeal, the defendants have adopted the district court's argument on standing. The plaintiffs, needless to say, have not. No matter; we conclude that the plaintiffs lack standing for a different reason: We could not issue an order in this case that would be likely to remedy the injuries complained of – including the primary complained of injury, *i.e.*, the alleged current and prospective misuses of the trust money – because the Tribe is not a defendant and none of the defendants controls the Tribe's challenged behaviors. In light of this holding, we decline to address either of the bases for dismissal relied upon by the district court.

A brief methodological note is appropriate before we give our reasons for concluding that the plaintiffs lack standing. Though at this stage we must accept as true the factual allegations in the plaintiffs' complaint, *see, e.g., National Fed'n of the Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999), *cert. denied*, 528 U.S. 1022 (1999), we need not accept as true their legal conclusions even if they are "cast in the form of factual allegations," *Warren v. Fox Family Worldwide*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003); *see Utah v. Babbitt*, 137 F.3d 1193, 1207 (10th Cir. 1998), or go to the merits of the suit, *see, e.g., Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997). Treating factual allegations differently from legal conclusions is sensible. Factual allegations are taken to be true at the motion-to-dismiss stage because the plaintiff has not had a full opportunity to conduct discovery and thereby uncover facts that support his or her claim. Legal conclusions, on the other hand, will not benefit from discovery; the court is fully equipped to resolve legal issues at this stage of the case, so there is no reason to forbear. To the contrary, given the Supreme Court's admonition to lower courts that we assure ourselves that jurisdiction exists (which includes determining whether a plaintiff has standing) before proceeding to the merits, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), we have an obligation to deal with legal issues to the extent that they relate to standing.

Article III of the Constitution requires three things to be true for a plaintiff to have standing to bring a suit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Only the third requirement matters for our purposes, and it is that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). Redressability is "substantially more difficult to establish" when "the plaintiff himself is not the object of the government action or inaction" because in that case it depends on "choices made by independent actors not before the court." *Id.* at 562 (internal quotations omitted); *see also Pritikin v. Dep't. of Energy*, 254 F.3d 791, 799-800 (9th Cir. 2001), *cert. denied*, 534 U.S. 1133 (2002). We first apply these principles to the plaintiffs' claims against the government defendants.

One remedy that the plaintiffs seek is rescission of the government's approval of the bond agreement. According to the plaintiffs, the bond deal is *ultra vires* because it constitutes a use of the money for a purpose other than that specified by Congress in the Act. To cure this difficulty, they ask us to void the government's approval of the agreement.

A rescission order, however, would not be likely to remedy the alleged harm because it would not be likely to prevent the Tribe from spending trust money on a new bond deal of the same sort. Congress amended § 81 in 2000, *see* Indian Tribal Economic Development and Contract Encouragement Act of 2000, Pub. L. No. 106-179, § 2, 114 Stat. 46, 46-47, and it no longer directs the Secretary of the Interior to approve almost every contract involving an Indian tribe in order for the contract to be valid. *See* 25 U.S.C. § 81. Instead, the Secretary's approval is necessary only for contracts that "encumber[ ] Indian lands for a period of 7 or more years." 25 U.S.C. § 81. The bond agreement is not a land-encumbering contract. So if we were to void the government's approval for the original bond agreement, the Tribe could enter a new bond contract that would pick up where the old one left off without needing to secure government approval. *Cf. Pritikin*, 254 F.3d at 800. There is some evidence

that the Tribe might indeed enter a new agreement.  The plaintiffs state in their brief that in 2002, after a change in leadership, the tribal council discontinued a suit to undo the bond deals; this was no surprise given that the newly elected chairman of the council had been chairman when the Tribe decided to enter the bond agreement. We are not certain that the Tribe would enter a bond agreement, but we do not have to be to conclude that a harm is not redressable for standing purposes.  *See Lujan*, 504 U.S. at 560-61.  What matters is that we think that the chances of the Tribe reissuing similar bonds are great enough that we cannot say that a rescission order is "likely" to remedy the alleged harm.

The plaintiffs counter that while a rescission order alone would not redress their harms, an order obligating the government to police tribal spending going forward, in conjunction with a rescission order, would be effective.  To this end, they suggest three sources of law that, they argue, obligate and empower the government to ensure that the Tribe spends the money appropriately.  One is 25 U.S.C. § 464, which, as mentioned earlier, requires the government to approve certain transfers of Indian property.  Another is the Act, and more specifically, § 4 and § 5 of the Act. Section 5 lays out the appropriate uses for trust money, and § 4 provides that "[t]he Tribe shall use the payments ... only for carrying out projects and programs pursuant to the plan prepared under section 5."  The last suggested source of obligation (and authority) is the fiduciary duty that the United States owes to the Indian people.

None of these legal sources obligates or empowers the government to control the Tribe's expenditures of the trust payments.  First, we address § 464.  It states, "no sale ... or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized [under the Indian Reorganization Act, of which this provision is a part, *Gobin v. Snohomish County*, 304 F.3d 909, 913 (9th Cir. 2002), *cert. denied*, 538 U.S. 908 (2003)], shall be made" except with the approval of the Secretary of the Interior under certain conditions.

Section 464 does not apply to this case. This case does not involve the transfer of restricted Indian lands. Nor does it implicate the transfer of "shares in the assets" of an Indian tribe or corporation organized under the Indian Reorganization Act. We give words in a statute their ordinary meaning absent some reason to do otherwise, *Mills Music Inc. v. Snyder*, 469 U.S. 153, 164 (1985); *BedRoc Ltd. v. United States*, 541 U.S. 176, 184 (2004); we discern no reason to do so here. Black's Law Dictionary defines a "share" as a "part or definite portion of a thing owned by a number of persons in common ... and has reference to that part of the undivided interest which belongs to some one of them." Black's Law Dictionary 1375 (6th ed. 1990). The Tribe's expenditure of trust payments does not amount to a transfer of shares in a tribal asset because paying a person, or promising to pay a person, is not the same as giving that person an ownership stake in an asset. *See Yonadi v. C.I.R.*, T.C. Memo. 1992-602, 1992 WL 266024 (1992), *reversed on other grounds*, 21 F.3d 1292 (3d Cir. 1994). Take, for example, the Tribe's expenditures so far. By the bond agreement, Crew has not obtained an ownership stake in the trust's asset, *i.e.*, the trust fund. It does not have the right to control disposition of the asset, nor does it stand to benefit (or suffer) from changes in its value (unless, of course, the money in the trust dips below the level necessary to fulfill the Tribe's payment obligation); it merely receives payments from the Tribe that happen to come from the fund. Since § 464 is inapplicable, the government could not use its Secretary-approval proviso to control the Tribe's spending.

The plaintiffs' argument pursuant to the Act is similarly untenable. Contrary to the plaintiffs' assertions, the Act gives the government no oversight duties (or powers); it simply puts the onus on the Tribe to spend the money properly. With respect to dispersal of trust money by the government, the Act provides simply that "[t]he Secretary of the Interior shall use [the trust money] only for the purpose of making payments to the Tribe." Act at § 4(d)(2)(C). That is it; the Act does not give the government the ability to earmark the money for specific purposes or do anything else of a similar character. Spending is left to the Tribe; as provided for in

§ 4(d)(2)(D), "[t]he Tribe shall use the payments ... only for carrying out projects and programs pursuant to the plan prepared under section 5." What is more, we do not think (and the plaintiffs do not urge) that, in making payments to Crew pursuant to the assignment, the government has contravened the Act because it has literally violated the requirement to "mak[e] payments to the Tribe." Such a reading of the Act would be foolishly literal and of no practical value – the Tribe could simply accept its payments from the government before sending them to Crew. We conclude, then, that the Act does not empower the government to control the Tribe's spending.

We turn next to the plaintiffs' fiduciary duty argument. There is a "general trust relationship between the United States and the Indian People." *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (*Mitchell II*). But that relationship alone does not suffice to impose an actionable fiduciary duty on the United States. *See United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); *United States v. Mitchell*, 445 U.S. 535, 541-43 (1980) (*Mitchell I*). Instead, to determine whether such a duty exists, we must look to "specific rights-creating or duty-imposing statutory or regulatory prescriptions." *See Navajo Nation*, 537 U.S. at 506. For a duty to exist, there must be something akin to " 'elaborate provisions ... [that] give the Federal government full responsibility to manage Indian resources for the benefit of the Indians.' " *See Id.* at 507 (quoting *Mitchell II*, 537 U.S. at 224, 225). The fact that a statute uses the word "trust" does not mean that an actionable duty exists, for a "bare trust" that does not impose upon the government the extensive and well-articulated duties described above falls short of creating such a duty. *See Mitchell II*, 463 U.S. at 224; *Mitchell I*, 445 U.S. at 541.

The plaintiffs argue that the Act creates an actionable fiduciary duty, but this argument is unsupportable because, as discussed above, the Act does not authorize the government to manage the Tribe's expenditures of trust payments. Thus the Act

does not provide the reticulated legal structure necessary to create an actionable duty under the Supreme Court's precedent.

In short, we can issue no order in this case that is "likely" to redress the plaintiffs' claims. *Lujan*, 504 U.S. at 562. The underlying difficulty for the plaintiffs is that they "seek to change the defendant's [*i.e.*, the government's] behavior *only as a means* to alter the conduct of a third party [the Tribe], not before the court, who is the direct source of the plaintiff's injury." *Common Cause v. Department of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983). This is a problem because for this approach to be successful the defendant must have control over the third party's (case-relevant) behavior, and as discussed above, the government does not have control over the Tribe's spending. Since the Tribe's spending is the cause of the primary harm alleged, and the Tribe is not a party, we are powerless to remedy the alleged harm. Courts have dismissed claims in similar circumstances in a number of other cases. *See, e.g., Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998); *Frank Krasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230, 235, 236 (4th Cir. 2005); *Pritikin*, 254 F.3d at 799-801; *Talenti v. Clinton*, 102 F.3d 573, 577-78 (D.C. Cir. 1996); *Fulani v. Brady*, 935 F.2d 1324, 1330-31 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 1048 (1992).

We briefly address two other harms identified by the plaintiffs before turning to the private-party defendants. The first is a so-called procedural harm that the plaintiffs say has befallen them, namely, that the Tribe did not, as required by the Act, consult with the Secretaries of the Interior and Health and Human Service before creating a spending plan. This alleged harm is irremediable for the same reason that the purported substantive harm discussed above is: the government cannot control the Tribe on this score. The other harm is the Tribe's supposedly improper waiver of its sovereign immunity. Again, we could not issue an order that would remedy this harm because we do not know of any authority that would allow the government to

-10-

prohibit the Tribe from waiving its sovereign immunity in a bond agreement like the one in this case.

Finally, we dismiss the plaintiffs' claims against the private-party defendants for the same reason that we dismiss their claims against the government: We could not issue an order against these parties that would remedy the plaintiffs' harm because the harm stems from the Tribe's actions, and none of the private parties controls the Tribe's actions.

### III.

For the above stated reasons, we hold that the plaintiffs lack standing to maintain this suit and accordingly affirm the district court's judgment.

_____