**FLORIDA AUDUBON SOCIETY,**
**et al., Appellants,**

v.

**Lloyd M. BENTSEN, Secretary of**
**the Treasury, et al., Appellees.**

No. 94–5178.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 27, 1995.

Decided June 2, 1995.

James W. Moorman, Washington, DC, argued the cause for appellants. With him on the briefs were David F. Williams and Jonathan R. Stone, Washington, DC.

David C. Shilton, U.S. Dept. of Justice, Washington, DC, argued the cause for appellees. With him on the brief were Lois J. Schiffer, Asst. Atty. Gen., Albert M. Ferlo, U.S. Dept. of Justice, and Debra Kohn, I.R.S., Washington, DC.

Before: WALD, SENTELLE, and ROGERS, Circuit Judges.

1. The other appellants are the Florida Audubon Society, the Florida Wildlife Federation, and the Friends of the Earth.

2. Congress enacted § 40 as part of the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, § 232(b)(1), in order "to encourage the development of energy sources other than petrole-

Opinion for the court by Circuit Judge ROGERS.

Dissenting opinion by Circuit Judge SENTELLE.

ROGERS, Circuit Judge:

This appeal presents the question whether appellants, three environmental organizations and Diane Jensen,[1] have standing under the National Environmental Policy Act ("NEPA") to challenge the failure of the Secretary of the Treasury and the Commissioner of the Internal Revenue Service (together "the Secretary") to prepare an environmental impact statement prior to promulgating a final rule to allow a tax credit for an alternative fuel additive known as ethyl tertiary butyl ether ("ETBE"). The district court found that appellants lacked standing and granted summary judgment to the Secretary. Because we conclude that Ms. Jensen has standing, and we need not resolve the remaining standing claims, we reverse.

I.

Section 40 of the Internal Revenue Code provides a tax credit of 60 cents for each gallon of alcohol used in the production of a "qualified mixture" of alcohol and gasoline. 26 U.S.C. § 40(a), (b)(1) (1988 & Supp. V 1994).[2] Prior to 1990, ETBE did not qualify for the tax credit because, while derived in part from ethanol (an alcohol produced by fermenting sugar contained in corn, sugar beets, and sugarcane), the final mixture contains no ethanol. Without the tax credit, ETBE could not compete commercially with a similar fuel additive, methyl tertiary ether. In 1988, sixty-one United States senators, including representatives from corn and sugar producing states, urged the Secretary to announce that ETBE qualifies for the tax credit.

um products for use in motor fuels" by providing a refundable income tax credit on "alcohol (other than alcohol derived from petroleum, natural gas or coal) used in motor fuels." S.Rep. No. 394, 96th Cong., 1st Sess. 91 (1979), U.S.Code Cong. & Admin.News 1980, pp. 410, 500.

In 1989, the Secretary issued a proposed rule that would re-interpret "qualified mixture" to include blends derived from but not containing alcohol. *See* Alcohol Fuels Credit; Definition of Mixture, 54 Fed.Reg. 48,639 (Nov. 24, 1989). Explaining that the rule was based on "policy considerations," 54 Fed Reg. at 48,639, the Secretary's notice indicated that the proposed ETBE tax credit:

> will increase the substitution of ETBE for other octane enhancers that cause more pollution. Second, it makes ETBE a more viable means of increasing the oxygen content of gasoline, which should help smooth the transition to oxygenated fuels in those areas that are not in compliance with carbon monoxide standards. Third, it encourages the substitution of ETBE-gasoline blends (gasohol). ETBE does not absorb water, which means it is easier to transport than gasohol, and it can be blended into the gasoline with less pollution than the 'splash blending' of gasohol. Fourth, it may increase the demand of domestic ethanol because ETBE is easier to use than ethanol, *which would expand this alternative market for America's farmers.* Fifth, ETBE is a fuel, not just an octane enhancer, and it will displace some gasoline consumption. Substituting a renewable and domestically-produced fuel for imported petroleum will enhance national energy security and will improve the trade balance.

*Id.* at 48,640 (emphasis added). Comments submitted to the Secretary anticipated that the proposed tax credit would enlarge the market for sugar-containing crops such as corn and sugarcane. The National Corn Growers Association stated the new rule would "help open the door to a whole *new* market for the nation's corn farmer." Letter from Alan Kemper, President, National Corn Growers Ass'n, to the Commissioner of the Internal Revenue Service (Dec. 8, 1989).

In 1990, the Secretary promulgated a final rule. Identical to the proposed rule, it interpreted Section 40's reference to a "qualified mixture" to include products derived from alcohol "even if the alcohol is chemically transformed in producing the product so that the alcohol is no longer present as separate chemical in the final product." Alcohol Fuels Credit; Definition of Mixture, 58 Fed.Reg. 8946 (1990) (codified at 26 C.F.R. Part 1). In the notice accompanying the final rule, the Secretary rejected the suggestion that the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, required him to prepare an environmental impact statement ("EIS") for this rule modification because Treasury Directive ("TD") 75–02 provided a "categorical exception" from the EIS requirement for IRS regulations "interpreting, implementing, or clarifying" Internal Revenue Code provisions.

Appellants filed a complaint for a declaratory judgment against the Secretary pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and a permanent injunction barring the Secretary from enforcing the final rule on the ground that the Secretary had violated NEPA, 42 U.S.C. § 4332, by promulgating the ETBE tax credit without preparing an EIS. Asserting "a serious potential for harmful environmental consequences," appellants alleged that neither the Secretary "nor any other agency has undertaken any analysis of the ability of existing soil conservation and other environmental protection programs to mitigate adverse environmental consequences resulting from the ETBE tax credit." Appellants requested an order directing the Secretary to rescind the final rule and not to reissue a final rule until an adequate EIS has been prepared. They argued that the categorical exemption under TD 75–02 was invalid because it failed, contrary to NEPA regulations, 40 C.F.R. § 1508.4, to provide for "extraordinary circumstances" in which a normally excluded action may have a significant environmental effect requiring preparation of an EIS.

With regard to their standing, appellants alleged that the tax credit would stimulate increased corn cultivation in Minnesota and Michigan, and increased sugarcane farming in Florida. Appellants asserted in their complaint that they regularly used wildlife refuges and other locations in these regions that would likely be adversely impacted as a result of this anticipated increase in farming. They further claimed that the Secretary's failure to prepare an EIS deprived them of

information they needed to protect the areas in question.

In response to the parties' cross-motions for summary judgment on standing, the district court granted the Secretary's motion. The district court concluded that appellants had not satisfied the geographical nexus and causation requirements necessary to establish standing under NEPA. Appellants filed this appeal, and our review is de novo. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Harbor Ins. Co. v. Stokes*, 45 F.3d 499, 501 (D.C.Cir.1995); *Washington Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989).

## II.

■ To meet the case or controversy requirement of Article III of the Constitution, a litigant in the federal courts must demonstrate that the litigant has suffered (1) an actual or threatened injury that (2) is fairly traceable to the challenged action and (3) is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *City of Los Angeles v. National Highway Traffic Safety Admin.*, 912 F.2d 478, 483 (D.C.Cir.1990). In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), the Supreme Court explained that to satisfy the injury-in-fact requirement, a litigant must demonstrate "an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. at 2136 (citations and internal quotations omitted). Moreover, the Court noted that to satisfy the "causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not

before the court.'" *Id.* 504 U.S. at 560, 112 S.Ct. at 2136 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)).

■ To have standing under NEPA, appellants must show that the Secretary's alleged noncompliance with NEPA has "adversely affected" or "aggrieved" them, and that they are within the zone of interests protected by NEPA. *City of Los Angeles*, 912 F.2d at 492; *Committee for Auto Responsibility (C.A.R.) v. Solomon*, 603 F.2d 992, 997 (D.C.Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Under NEPA, a litigant is "aggrieved" by the agency's failure to prepare an EIS only if the litigant can show, first, that the failure "creat[es] ... a risk that serious environmental impacts will be overlooked," *see City of Davis v. Coleman*, 521 F.2d 661, 671 (9th. Cir.1975); *see also City of Los Angeles*, 912 F.2d at 492 ("NEPA gives rise to a cognizable injury from denial of its explanatory process, so long as there is a reasonable risk that environmental harm may occur."); and second, that the litigant has "a sufficient geographical nexus to the site of the challenged project that [the litigant] may be expected to suffer whatever environmental consequences the project may have." *City of Davis*, 521 F.2d at 671; *see also City of Los Angeles*, 912 F.2d at 483, 492.[3] The zone of interests requirement is satisfied so long as the litigant's interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987); *see also FAIC Securities, Inc. v. United States*, 768 F.2d 352, 357 (D.C.Cir.1985). A litigant who establishes injury within the zone of interests protected by NEPA "will necessarily have satisfied the constitutional injury requirement as well." *City of Los Angeles*, 912 F.2d at 483 (citation omitted).

**3.** Informational injury alone is not enough to confer standing under NEPA. *Foundation for Economic Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C.Cir.1991). Rather, appellants must establish that this deprivation has affected a concrete interest, which is met by establishing a geographical nexus.

Appellants forthrightly state that if any one of them has shown sufficient evidence to withstand summary judgment on standing, the court need not consider the standing of other appellants. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 161, 102 S.Ct. 205, 212–13, 70 L.Ed.2d 309 (1981); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,* 45 F.3d 469 (D.C.Cir.1995); *City of Los Angeles,* 912 F.2d at 485. We therefore confine our discussion to Ms. Jensen who presented sufficient evidence to demonstrate that she has standing to seek declaratory and injunctive relief requiring the Secretary to conduct an EIS before implementing the ETBE tax credit.

### A.

*Aggrievement under NEPA:* (1) *Risk of overlooking serious environmental harm.* The Secretary maintains that a complex and improbable sequence of events must ensue in order for the ETBE tax credit to affect the environment as appellants anticipate: namely, that the ETBE tax credit must prompt ETBE production, which must increase demand for ethanol, which must increase demand for corn, which must increase corn farming, which must cause environmental harm. With only one exception, however, the Secretary has failed to dispute appellants' proffered evidence establishing the likelihood of each of these causal links and the connections between them. The Secretary does not dispute record evidence that increased corn farming would adversely affect the environment by, among other things, increasing erosion and water pollution as farmers plant crops on now idle or underused land and expand their use of pesticides and fertilizers. It is also undisputed that an increased demand for ethanol would increase domestic corn production. Professor Peter Berck, an agricultural resource economist at the University of California (Berkeley), estimated that, as a result of the tax credit, the

acreage of farm land devoted to growing corn would increase by between 281,000 acres to 14 million acres, depending on which of several projections regarding increased demand for ethanol proves to be correct. Insofar as estimates regarding increased ethanol production prove correct, the Secretary does not dispute Professor Berck's conclusions.

■ As a result, the question whether appellants have established the first prong of NEPA's injury-in-fact requirement depends solely on the likelihood that the ETBE tax credit will stimulate demand for ethanol. While future demand for ethanol cannot be estimated with certainty, appellants need not proffer conclusive proof that an increase in demand will occur; rather, they need only establish a reasonable risk that such an increase will occur. *See City of Los Angeles,* 912 F.2d at 492; *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1355 (9th Cir.1994) (upholding standing to challenge adequacy of EIS on proposed use of herbicides and noting that "[s]peculation that the application of herbicides might not occur is irrelevant"); *see also Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758; *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1515 (9th Cir.1992); *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491 (9th Cir.1987); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531.4 (2d ed. 1984 & Supp.1994).

Although the Secretary maintains in his brief that the ETBE credit cannot reasonably be expected to increase ethanol demand, this position is in direct conflict with one of his stated purposes in proposing the tax credit. *See* Alcohol Fuels Credit; Definition of Mixture, 54 Fed.Reg. 48,639 (to be codified at 26 C.F.R. Part 1) (Nov. 24, 1989). It is also contrary to record evidence that proponents of the ETBE tax credit expected the credit to increase demand for ethanol and corn production.[4] The Secretary's own ex-

---

4. *See* Letter from Clayton Yeutter, Secretary of Agriculture, to Nicholas F. Brady, Secretary of the Treasury, (Mar. 20, 1989); Letter from Clayton Yeutter, Secretary of Agriculture, to Honorable J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate (Nov. 2, 1989); Letter from Alan Kemper,

President, National Corn Growers Ass'n, to the Commissioner of the Internal Revenue Service, (Dec. 8, 1989); Letter from Criss Davis, President, Wisconsin Corn Growers Ass'n, to the Commissioner of Internal Revenue (Dec. 20, 1989); Outline of Comments on Tax Credits for ETBE, Frederick C. Spreyer, State of Hawaii,

pert evidence, in a statement of Professor Leo Polopolus and Professor Andrew Schmitz, indicated that the "development and growth of the corn based U.S. ethanol industry is due to the various federal and state tax incentives, subsidies, and loan guarantees." Indeed, unless we assume that the Secretary promulgated the ETBE tax credit as nothing more than an empty gesture, it is difficult to understand his argument that the credit will have no impact on ETBE and ethanol production. The Secretary's unsupported contention that the ETBE tax credit cannot reasonably be expected to accomplish its professed purpose fails to give rise to a disputed issue of material fact such that summary judgment would be unwarranted. *See City of Los Angeles,* 912 F.2d at 492; *see Idaho Conservation League,* 956 F.2d at 1516 ("[S]hort of assuming that Congress imposed useless procedural safeguards, and that wilderness designation is a superfluous step, we must conclude that the management plan plays some, if not a critical part, in subsequent decisions.").[5]

■■■ That the environmental harms appellants anticipate result from a chain of events rather than directly from the agency's action does not defeat their standing under NEPA. *See Idaho Conservation League,* 956 F.2d at 1515; *Wilderness Soc'y v. Griles,* 824 F.2d 4, 12, 18 (D.C.Cir.1987). A litigant has standing under NEPA even if third parties must take action before the threatened environmental harm occurs. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Idaho Conservation League,* 956 F.2d at 1515;

*Kunzman,* 817 F.2d at 491. Furthermore, while a litigant can challenge NEPA compliance even where the agency itself must take additional action before the threatened harm can come to pass, *see Sierra Club v. Marita,* 46 F.3d 606, 612–13 (7th Cir.1995); *Idaho Conservation League,* 956 F.2d at 1515; *Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n,* 679 F.2d 1218, 1221–22 (7th Cir.1982); *but see Sierra Club v. Robertson,* 28 F.3d 753, 785–60 (8th Cir.1994), here the Secretary has completed the relevant portion of his involvement. Indeed, were appellants to wait for the Secretary to accept a particular claim for the tax credit, the environmental damage that NEPA's forward-looking scheme was intended to avoid might already have happened. The Secretary does not suggest any other point at which appellants could challenge the Secretary's failure to conduct an EIS.

Thus, the Secretary's suggestion that appellants lack standing because the injury they allege is speculative confuses the anticipated environmental consequences of the tax credit with the NEPA injury appellants actually claim. Consistent with NEPA standing requirements, appellants claim injury stemming from the Secretary's failure to consider the anticipated environmental impacts. Where there is a reasonable risk of severe environmental harm and the agency has not complied with NEPA's requirements, the injury is real, not conjectural. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989) (Congress designed NEPA to ensure that "important effects will not be over-

Dep't of Business and Economic Development; Letter of Daryl Reid, President Illinois Corn Growers Ass'n, to Commissioner of Internal Revenue (Dec. 12, 1989). *See also Market Hinges on Favorable Treasury Dep't Ruling,* Alcohol Week 6–7 (Oct. 24, 1988).

5. Although the Secretary advises that the ETBE tax credit has yet to prompt domestic ETBE production, this can be explained in several ways and does not undercut appellants' standing. The Secretary of Agriculture, who supported promulgation of the credit because of its anticipated long-term effects on the corn and sugar markets, recognized that short-term prospects for increased demand were limited. *See* Letter from

Clayton Yeutter, Secretary of Agriculture, to Nicholas F. Brady, Secretary of the Treasury, (Mar. 20, 1989). In addition, uncertainty about the tax credit's continued viability—stemming in part from this litigation—may explain the ethanol industry's decision to delay investment in ETBE production. *Cf. Lawsuit Challenging Credit Still Alive; ETBE Credit Hangs in Balance as Congress Fails to Clarify Issue in Budget Bill,* 11 Alcohol Week's New Fuels Report No. 44, at 1 (Nov. 5, 1990). Moreover, uncertainty regarding the timing and scope of the anticipated expansion in corn farming supports rather than defeats appellants' standing. *See City of Los Angeles,* 912 F.2d at 494.

looked or underestimated only to be discovered after resources have been committed or the die is otherwise cast."); *City of Los Angeles*, 912 F.2d at 491 (NEPA is a "future-oriented scheme"); *id.* at 504 (R.B. Ginsburg, J., concurring) (citing *Public Citizen v. National Highway Traffic Safety Admin.*, 848 F.2d 256, 269 n. 2 (D.C.Cir.1988) (Silberman, J., dissenting in part) ("Standing analysis is different under NEPA, which confers a *procedural* right to have environmental impacts considered. A party is therefore 'aggrieved' if an agency fails to take the mandated procedural steps, provided the party actually asserts a bona fide environmental interest and is within the geographical area where the suspected impact is likely to occur.")); *see also Idaho Conservation League*, 956 F.2d at 1515.

The possibility that crop production will increase absent the ETBE tax credit does not thwart appellants' assertion that the failure to prepare an EIS created the risk that a serious environmental impact was overlooked. That the ETBE tax credit contributes to existing environmental harms or encourages new ones is sufficient to confer standing. *See City of Los Angeles*, 912 F.2d at 495–97; *Public Citizen v. Office of the United States Trade Representative*, 822 F.Supp. 21, 28 (D.D.C.1993), *rev'd on other grounds*, 5 F.3d 549 (D.C.Cir.1993), *cert. denied.*, —— U.S. ——, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994). Appellants have established that the ETBE tax credit is likely to increase corn production in addition to projected expansion unrelated to the credit and it is this marginal impact that appellants challenge through their NEPA claim.

For the same reason, we find unpersuasive the Secretary's contention that the increase in corn farming anticipated by appellants would not have a perceptible effect given the total acreage already devoted to corn farming in the United States. Even if the aggregate increase in corn farming is not significant, the devotion of now idle or underused land to corn farming can dramatically affect the particular environments where it occurs.

It is that localized incremental impact that appellants directly challenge.[6] *See infra* Part II A(2); *cf. City of Los Angeles*, 912 F.2d at 484 (D.H. Ginsburg, J., dissenting in part) (concluding that environmental organization lacked standing in part because it failed to challenge incremental harm wrought by the agency's decision).

As the Ninth Circuit has observed, the court must "bear in mind the statutory source that defines appellants' right and imposes [the Secretary's] duty. The standing examination, in other words, must focus on the likelihood that the defendant's action will injure the plaintiff *in the sense contemplated by Congress.*" *Idaho Conservation League*, 956 F.2d at 1516. Viewed in this light, the promulgation of the ETBE tax credit without an EIS is harmful for purposes of standing by creating the risk that it will lead, through a reasonably direct chain of events, to serious environmental harm caused by farm run-off and erosion.

■ (2) *Geographical nexus.* To establish injury-in-fact under NEPA, a litigant must also have "a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." *City of Davis*, 521 F.2d at 671. Appellants need not establish with certainty that particular locations they use will be affected by the agency action but rather must establish a sufficient geographical nexus to the location "at which the environmental consequences are likely to be felt." *City of Los Angeles*, 912 F.2d at 494; *see also Idaho Conservation League*, 956 F.2d at 1517. We conclude that Ms. Jensen, based on her sworn declaration and deposition, has established this nexus. *Lujan v. Defenders of Wildlife*, 504 U.S. at 562–63, 563–64, 112 S.Ct. at 2137, 2138.

■ In her sworn declaration, Ms. Jensen explained that she and her family regularly use and enjoy particular locations in Minnesota, including the Sherburne National Wildlife Refuge Rum River State Forest, Whitewater Wildlife Area, and Lac Qui Parle

---

**6.** Furthermore, the Secretary bases his contention on the smallest acreage increase projected by Professor Berck. He does not suggest that should a larger increase occur, the aggregate impact on corn farming would be insignificant.

Wildlife Area. At her deposition, in response to the government's request, she identified ten areas, with an average diameter of twenty-five miles, that she regularly visits for her recreational activities. In her declaration she stated that these activities include hiking, canoeing, cross-country skiing, birdwatching and photography, and fishing throughout undeveloped natural areas adjoining Minnesota land used for corn farming and susceptible to increased corn production. The Secretary does not dispute that Ms. Jensen has more than " 'some day' intentions" to visit these areas, cf. Lujan v. Defenders of Wildlife, 504 U.S. at 563–64, 112 S.Ct. at 2138, and that she has alleged that these particular locations, and not land in its vicinity, are likely to be adversely affected by the ETBE tax credit. Cf. Lujan v. National Wildlife Federation, 497 U.S. 871, 887–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

Furthermore, Ms. Jensen has proffered unrefuted evidence that the ETBE tax credit is likely to affect areas she uses. Based on her experience on several Minnesota environmental task forces, state environmental advisory groups, and the state Board of Water and Soil Resources,[7] Ms. Jensen states in her sworn declaration that local farmers, who now receive state subsidies to leave some land fallow and rotate fields, are likely to abandon the subsidy and develop these lands in order to take advantage of the tax credit. As a result, Ms. Jensen states, marginally productive lands, which require more fertilizer and pesticides to farm and are more susceptible to erosion, are likely to be cultivated. She further states that greater yields can be obtained from Minnesota farmland already devoted to corn farming through increased use of pesticides and fertilizer, which would threaten wildlife habitats by causing greater soil erosion and water pollution. Ms. Jensen also refers to meetings in which state repre-sentatives have advised her that the ETBE tax credit is likely to increase corn farming in Minnesota and that an EIS could destroy market opportunities for Minnesota corn. From this unrefuted evidence, the likelihood that the ETBE tax credit will stimulate increased corn production on lands neighboring those used by Ms. Jensen, and the fact that Minnesota is the fourth-largest corn-producing state in the United States, it reasonably follows that Ms. Jensen uses lands likely to be affected by the ETBE tax credit.

In his memorandum in support of summary judgment the Secretary argued that appellants "do not and cannot specify what lands throughout the nation not already used for agriculture will be converted into croplands, and what lands will be switched from producing other crops to producing corn and beets." The Secretary stated that Ms. Jensen "does not even attempt to specify which lands will ·be affected." In his brief, the Secretary contends that appellants' affidavits generally present "no competent evidence indicating that farmers near where plaintiffs recreate are planning to intensify crop production." The Secretary also points to the fact that Professor Berck acknowledged that he could not determine the precise geographic location where increased corn production would occur.

The critical point, however, is that Ms. Jensen need not establish that increased corn farming is certain to occur and affect adversely the locations she uses and enjoys. Rather, to have standing under NEPA, she need only establish that such farming is likely to affect these regions. City of Los Angeles, 912 F.2d at 494; Salmon River, 32 F.3d at 1355 n. 14; Idaho Conservation League, 956 F.2d at 1517; Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1303 (9th Cir.1993).[8]

7. Since 1985, Ms. Jensen has been employed by, and since 1987 has been a co-director of, the ·Minnesota branch of Clean Water Action, a national environmental organization that advocates protection of .natural resources. She was a member of a 1989 advisory group that prepared legislation (later adopted by the state legislature) to protect groundwater in Minnesota, and has served, by appointment, on three state environmental advisory groups. In addition, since 1989 she has been the Minnesota State Governor's appointee to the Great Lakes Protection Fund Board. From 1990 to 1992, she served as the Governor's appointee to the Minnesota Board of Water and Soil Resources, which administers the state soil and water conservation districts, county water planning and the state's farmland set-aside programs.

8. Nothing in Wilderness Society v. Griles or Lujan v. National Wildlife Federation supports a contrary result. Both involved site-specific govern-

In *Idaho Conservation League*, for example, the plaintiffs claimed to use approximately 100,000 acres in the Idaho Panhandle Forest, but they could not identify whether this region, comprising less than one-quarter of the land that the Forest Service had designated for development, would in fact be developed. The Ninth Circuit concluded that the plaintiffs could do no more to identify specific sites in the absence of the agency's designation of development areas. 956 F.2d at 1514–17.

Because the geographical nexus component of NEPA standing is properly equated with the "concrete interest" test articulated by the Court in *Lujan v. Defenders of Wildlife, see Douglas County v. Babbitt*, 48 F.3d 1495, 1500–01 n. 5 (9th Cir.1995), this *is* a case where the litigant is "seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of [hers]." *Lujan v. Defenders of Wildlife*, 504 U.S. at 571, 112 S.Ct. at 2142. Hence, the district court erred in ruling that Ms. Jensen had failed to established the requisite geographical nexus.[9]

### B.

■ *Causation.* The question remains whether appellants have demonstrated that the injury is "fairly traceable" to the proposed ETBE tax credit. *City of Los Angeles*, 912 F.2d at 496 (citation omitted). Contrary to the Secretary's contention, causation under NEPA is not lacking simply because the alleged environmental effects will be produced by "the independent choices made by third parties (here, potential ETBE manufacturers and farmers)." This argument is "better addressed to the first prong of the standing test." *Idaho Conservation League*, 956 F.2d at 1517 ("in cases involving chains of events, it is common to confuse ... the issue of the *likelihood* of harm with its

cause."); *see also Griles*, 824 F.2d at 18 ("[T]he likelihood of injury, whether or not that likelihood depends upon a single event or a chain of events, is properly a concern of the personal injury inquiry, not the causation injury.").

Here, appellants' claimed injury is the risk that the failure to prepare an EIS will cause serious environmental consequences to be overlooked. That harm flows directly from the Secretary's failure to prepare an EIS, notwithstanding the fact that other actors are needed for increased ethanol production to occur. Hence, the Secretary's reliance on *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1975), is misplaced because neither case involved NEPA, where the cognizable injury is that the failure to comply with the statute creates the risk environmental harms will be overlooked and not that this failure necessarily causes the ultimate harm anticipated. Moreover, there appears to be a reasonable prospect that full consideration of the environmental consequences of the ETBE tax credit might prompt the Secretary to rescind or otherwise modify the tax credit because the Secretary emphasized, in proposing the rule extending the tax credit to ETBE, that several environmental benefits would result. *See* 54 Fed.Reg. at 48640. The causal nexus between the alleged injury and absence of an EIS is met by the prospect that the Secretary will rescind or otherwise modify the ETBE tax credit were the environmental consequences of the tax credit spelled out in more detail in an EIS. *See Public Citizen v. National Highway Safety Administration*, 848 F.2d at 263 n. 27; *see also Lujan v. Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7 ("There is much truth

---

ment action that affected identifiable lands that plaintiffs did not claim to use. *Griles* did not arise under NEPA. *National Wildlife Fed'n*, 497 U.S. at 887–89, 110 S.Ct. at 3188–89; *Griles*, 824 F.2d at 13. Here, appellants challenge non-site specific agency action that threatens numerous locations.

9. Appellants further contend that the district court erred in concluding that appellants other

than Ms. Jensen have failed to establish a geographical nexus and improperly granted summary judgment given the disputed evidence concerning the likelihood that the ETBE tax credit will increase sugarcane production in Florida. Because of appellants' position on their standing claims and because we conclude that Ms. Jensen has met the standing requirements, we need not reach these issues.

to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.")

### C.

█ *Redressability.* The nature of appellants' claimed injury demonstrates its redressability. Appellants have met their burden to show that the injury they claim—the risk that serious environmental harms were overlooked in promulgating the ETBE tax credit—will be redressed by having the Secretary conduct an EIS. Appellants need not establish that the Secretary would not have promulgated the ETBE tax credit had he conducted an EIS. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 572–73 n. 7, 112 S.Ct. at 2142–43 n. 7; *Idaho Conservation League,* 956 F.2d at 1518; *City of Los Angeles,* 912 F.2d at 499; *Munoz–Mendoza v. Pierce,* 711 F.2d 421, 428 (1st Cir.1983).[10]

### D.

█ *Zone of Interest.* In enacting NEPA, Congress declared that in view of:

the profound impact of man's activity on the interrelations of all components of the natural environment ... [and] the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, ... it is the continuing policy of the Federal Government ... to use all practicable means and measures ... in a manner calculated to foster and promote the general welfare.

42 U.S.C. § 4331(a). To carry out this policy, Congress directed that, "to the fullest extent possible, ... all agencies of the Federal Government shall ... include in every ... major Federal action[ ] significantly affecting the quality of the human environment, a detailed [environmental impact statement ('EIS') ]." Id. § 4332. The environmental harms stemming from increased corn farming suggested by appellants' proffers, and no less by Ms. Jensen's sworn declaration, fall within the broad trusteeship established by NEPA. *City of Los Angeles,* 912 F.2d at 495; 42 U.S.C. § 4331(b)(1).

Unlike the taxpayer standing cases on which the Secretary relies, appellants do not challenge the tax credit itself, but only the Secretary's failure to fulfill the continuing federal environmental policy adopted by Congress in NEPA.[11] See 42 U.S.C. § 4331(a). As one of NEPA's sponsors forewarned, "It is far cheaper in human, social, and economic terms to anticipate these problems at an early stage and to find alternatives before they require the massive expenditure we are now obligated to make to control air, water, and oil pollution." *See* 115 Cong.Rec. S3,700 (daily ed. Feb. 18, 1969) (statement of Sen. Jackson). Ms. Jensen has demonstrated her geographical nexus to lands that are likely to be affected by increased corn production by reason of the tax credit. The Secretary's suggestion, based on the categorical exemption under TD 75–02, that no one has standing to challenge the ETBE tax credit, not just that this case was brought by the wrong litigants, erroneously invokes his position on the merits as the reason to deny her (and the other appellants) standing, *see Jacobs v. Barr,* 959 F.2d 313, 316 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 95, 121 L.Ed.2d 56 (1992), and we do not reach the merits here.

Accordingly, we hold that appellants have demonstrated that Ms. Jensen has standing

---

**10.** The Secretary' reliance on *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 and *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 32–33, 96 S.Ct. at 1921, this time for his contention that appellants' injury is not redressable, is again misplaced. Neither *Allen* nor *Simon* involved NEPA or a litigant's claim alleging a procedural injury that impacts a concrete interest. *See also Idaho Conservation League,* 956 F.2d at 1518.

**11.** *Cf. Allen v. Wright,* 468 U.S. at 759–61, 104 S.Ct. at 3329 (no third-party standing to challenge IRS grant of tax-exempt status to private schools); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. at 41, 96 S.Ct. at 1925–26 (no third-party standing to challenge IRS grant of tax-exempt status to particular hospitals); *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Fulani v. Brady,* 935 F.2d 1324, 1327 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992).

to pursue declaratory and injunctive relief in the district court, and we reverse the grant of summary judgment to the Secretary and remand the case with instructions to grant appellants' cross-motion for summary judgment on standing insofar as Ms. Jensen has established standing.

SENTELLE, Circuit Judge, dissenting:

In a remarkably ambitious complaint, appellants sought to accomplish through the courts what they apparently had failed to achieve in the political branches and the administrative process: that is, they prayed the district court to enjoin the extension of the Alcohol Fuel Tax Credit created by 26 U.S.C. § 40 (1988) to fuel blends containing gasoline and ethyl tertiary butyl ether ("ETBE"). The district court granted summary judgment against them as they all lacked standing to bring the action. As I think the district court was wholly correct, I would affirm.

## I.

To meet "the irreducible constitutional minimum of standing," plaintiffs must establish three elements: (1) injury in fact, i.e., the plaintiff must have suffered an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) causation (or traceability), i.e., the injury has to be " 'fairly ... trace[able]' to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;" and (3) redressability, i.e., it must be likely that the injury will be redressed by a favorable decision by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). These requirements are an "indispensable part of the plaintiff's case, each element [of which] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof...." *Id.* To survive a summary judgment motion, a "plaintiff can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " supporting each element of standing. *Id.* 504 U.S. at

561, 112 S.Ct. at 2137 (citing FED.R.CIV.P. 56(e)).

As the majority notes, in the NEPA context, we have held that plaintiff meets the injury requirement by demonstrating that an agency's failure to prepare an environmental impact statement ("EIS") creates " 'risk that serious environmental impacts will be overlooked,' " *City of Los Angeles v. NHTSA*, 912 F.2d 478, 492 (D.C.Cir.1990) (quoting *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975)), and that the plaintiff has "a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." *Id.* (citation omitted). Though we have phrased the plaintiff's burden differently in the NEPA context, she still must be able to demonstrate, at the summary judgment stage by evidence of specific facts, the genuine likelihood of an overlooked "risk" of "serious environmental impacts" to particularized interests resulting from the failure to prepare an EIS. *See id.* at 492, 494 ("NRDC has satisfied the geographical nexus requirement of NEPA standing by showing the likelihood of *particularly devastating consequences to NRDC members in California.*") (emphasis added).

In this case, the district court's determination that appellants had not sufficiently set forth specific facts to survive summary judgment on the issue of standing is correct. Appellants not only have failed to demonstrate a causal nexus between the Department of Treasury's action and an actual risk of an environmental impact, but also have not demonstrated a sufficient geographical nexus to lands which are likely to be injured as a result of the ETBE tax credit, and thus have not been "injured in fact."

### A. *Causation.*

In order to demonstrate standing, a NEPA plaintiff must show, among other things, that the agency has failed to prepare an EIS in the face of a reasonable risk that environmental harm will occur. *City of Los Angeles*, 912 F.2d at 492. In the context of a NEPA challenge to an IRS rule extending a tax credit to individual taxpayers, the "risk" as-

sessment presents a special problem for the NEPA plaintiff. Here, we must consider the tax standing cases, *see, e.g., Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Fulani v. Brady,* 935 F.2d 1324 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992), because the risk assessment depends upon "the independent action of some third party not before the court." *Simon,* 426 U.S. at 42, 96 S.Ct. at 1926. As the Supreme Court has noted in another context,

> When ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* ... causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."

*Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. at 2137 (emphasis in original) (quoting *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) (opinion of Kennedy, J.)). In this particular case, third party alternative fuel producers must first avail themselves of the tax credit before any genuine risk of environmental harm would arise. The speculative nature of that contingency highlights the "special problems attendant upon the establishment of standing in ... tax cases, when a litigant seeks to attack the tax exemption of a third party." *Fulani,* 935 F.2d at 1327 (internal quotations omitted; citations omitted).

Although it is fashioned as a NEPA challenge, appellants' case is in fact a challenge to the IRS's extension of a tax credit to third parties: the ETBE producers. Therefore, to evaluate the claim, we look to the likely effect of the credit on those third parties. Although neither we nor the Supreme Court have ever answered a tax standing question on facts exactly parallel to those presented by appellants' complaint, both courts have found no standing present in cases instructively analogous and indeed rejected plaintiffs having arguably less tenuous claims to standing than do appellants.

In *Simon, supra,* indigents challenged the IRS's modification of a previous revenue ruling requiring that charitable hospitals care for patients without charge or at rates below cost. 426 U.S. at 32, 96 S.Ct. at 1921. The modification extended charitable status to hospitals which denied non-emergency treatment to indigents. *Id.* at 30–31, 96 S.Ct. at 1920–21. The Court held that the plaintiffs lacked standing to challenge the ruling because they could not meet the causation requirement. *Id.* at 40–46, 96 S.Ct. at 1925–28. The Court noted that "[t]he implicit corollary of [plaintiffs'] allegation is that a grant of [their] requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would 'discourage' hospitals from denying their services to [plaintiffs]." *Id.* at 42, 96 S.Ct. at 1926. The Court rejected that reasoning, stating, "It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43, 96 S.Ct. at 1926. Again, in *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556, the Court rejected the standing of third-party challengers to tax exemptions. In response to a claim by parents of black children attending public schools in districts undergoing desegregation that an IRS grant of tax exemptions to racially segregated private schools interfered with their children's right to an integrated education, the Court noted that the injury to plaintiffs was "highly indirect" because it "results from the independent action of some third party not before the court." 468 U.S. at 757, 104 S.Ct. at 3327 (citation omitted). The Court reasoned that it was "entirely speculative ... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies. It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the

child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status." *Id.* at 758, 104 S.Ct. at 3328 (citation omitted).

As in *Simon* and *Wright,* the line of causation in this case is "highly speculative." The danger that an increased risk of environmental injury might be overlooked here depends, in the first instance, upon the decisions of fuel manufacturers to increase their ETBE production or, alternatively, to enter the market in order to take advantage of the tax credit. Although the Secretary promulgated this rule hopeful that it *"may* increase the demand for domestic ethanol," 54 Fed.Reg. 48,639, 48,640 (1989) (emphasis added), whether manufacturers in fact take advantage of the credit remains to be seen, and "the courts cannot presume either to control or to predict," *Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. at 2137 (citation omitted), this contingency.

Even as it estimated in hearings that 350 million gallons of ethanol for ETBE manufacture might be necessary by 1995, the Renewable Fuels Association cautioned that its estimate was "entirely dependent upon factors which the ethanol industry will not control: the cost of competing feedstock—methanol; the environmental standards established for gasolines of the future; and the continuation of federal incentives for ethanol blended fuels." Additionally, the chemical industry press has noted that "[a]nother obstacle for ETBE is the limited availability of isobutylene." Carl Verbanic, *ETBE: Ethanol's Motor Fuel Hope?,* CHEMICAL BUSINESS, October, 1988, at 39. Thus, according to supporters of the ruling, whether the industry will take advantage of the tax credit depends upon market factors beyond the government's, and even the industry's, control. Indeed, as the district court noted, notwithstanding that the ruling had been in force for more than four years at the time of argument below, ETBE was still not produced commercially in this country. Against this uncertain backdrop, it can hardly be said that an increased risk of environmental harms is likely as a result of the IRS rule.

Thus, contrary to the majority's conclusion that "the Secretary's suggestion that appellants lack standing because the injury they allege is speculative confuses the anticipated environmental consequences of the tax credit with the NEPA injury appellants actually claim," maj. op. at 879, I believe the Secretary has it right. Appellants meet the NEPA injury requirement only if their evidence demonstrates a reasonable risk of severe environmental harm coupled with the failure to prepare an EIS. *See City of Los Angeles,* 912 F.2d at 492. Otherwise put, the federal action—in this case the extension of the tax credit—must cause the creation or increase of an environmental risk which the EIS might disclose. That risk cannot be measured where the environmental consequences of the tax credit are highly speculative and subject to independent third-party action and market forces.

Thus, appellants' claim to standing fails at the very first step of causation. Even if it did not, however, appellants' showing on the further steps are even more attenuated than the first. Even if we assume that manufacturers were likely to take advantage of the tax credit, increasing production of ETBE and therefore ethanol, appellants are short of demonstrating by evidence that at that unspecified point in the future this increase would come from devotion of greater areas of land to the agricultural production of corn, sugar cane, and sugar beets, as opposed to the reorientation of lands already under cultivation, or other means of increased agricultural production. Even if they had demonstrated that step, or if we could presume it, appellants' standing would still trip at the next stage of NEPA standing analysis: geographical nexus.

B. *Geographical Nexus.*

*City of Los Angeles* requires that the NEPA plaintiff demonstrate "a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." 912 F.2d at 492 (citation omitted). The majority today concludes that this important facet of the "injury

in fact" requirement of standing may be met with speculation and baseless assumptions.

Appellant Jensen submitted a sworn statement to the court that she and her family regularly use several recreational areas abutting farm land in Minnesota, as did other appellants in other states. The majority notes that these farm lands are "susceptible to increased corn production." Maj. op. at 881. Jensen claimed in her sworn statement that local farmers "are likely to abandon [their tax] subsidy and develop these lands in order to take advantage of the tax credit." Maj. op. at 881. Additionally, Jensen pointed to speculation by state representatives that the ETBE credit was likely to increase corn farming in Minnesota. Combined with the fact that Minnesota is a large corn producing state, the majority concludes from this evidence that Jensen meets the geographical nexus test. *Id.*

Apart from the causation problems addressed in the previous section, appellants' case fails to satisfy the minimal geographic nexus test. Even in the NEPA context, plaintiffs must be able to demonstrate that lands which they enjoy are likely to be subjected to an increased risk of environmental damages. *See City of Los Angeles*, 912 F.2d at 494. Plaintiffs' proffer fails to demonstrate that nexus. Even if we assume the attenuated steps of causation to the point at which increased corn production would occur, nothing in the plaintiffs' proof demonstrates that land enjoyed by them would likely be affected by the increased corn production. The fact that Minnesota is the fourth largest corn producing state in the Union does not demonstrate that those specific lands within Minnesota which Jensen enjoys are likely to be affected. Again, that contingency rests upon the independent choices of third-party farmers who may or may not choose to take advantage of the increased demand for corn (or other ethanol sources). *See Defenders of Wildlife*, 504 U.S. at 562–63, 112 S.Ct. at 2137. Ms. Jensen herself admitted in a deposition that she was unaware of, and in fact, unable to discern, which specific lands were likely to be affected by increased grain production, as the following dialogue suggests:

**Q.** Do you knew precise (sic) what the impacts would be?

**A.** **(By Ms. Jensen).** Studies have shown that regular use of corn pesticides have shown up in the ground water and I can only infer that the ... additional use of these pesticides would increase the ground water contamination in the state.

**Q.** Do you have any way of knowing which farmer is going to increase his crop at this time as a result of this incentive?

**A.** No.

**Q.** Do you have any way of knowing where an additional pesticide application may occur?

**A.** No.

**Q.** Do you believe that there is any way you could know that without further academic study taking place?

**A.** There is absolutely no way.

Defendants' Exhibit 8 at 137–38.

Ms. Jensen's inability to point out specific areas that are likely to be affected by the crop increase illustrates why the causation element cannot be met where the independent action of a third party is a necessary link in the causation chain. In order to demonstrate standing, Ms. Jensen must be able to demonstrate that the lands *she* uses are likely to be affected. She, as well as the other plaintiffs in this case, has not done so.

*City of Los Angeles* requires no less. In that case, we found that the geographical nexus test was met specifically because the plaintiffs were successful in demonstrating that the area in which they lived, California, would likely be subject to *"particularly devastating consequences"* relating to the greenhouse effect which might occur as a result of a proposed rollback of fuel economy standards. 912 F.2d at 494 (emphasis added). Appellants have not demonstrated that areas they enjoy will or are even likely to be damaged by the federal action which they claim requires an environmental impact statement.[1] The majority opinion today

1. The majority also relies on *Idaho Conservation League v. Mumma,* 956 F.2d 1508 (9th Cir.1992).

888

obliterates the requirement that NEPA plaintiffs prove a geographical nexus to the challenged action. *See Defenders of Wildlife,* 504 U.S. at 563, 112 S.Ct. at 2137–38.

## II.

Plaintiffs may ask, "If we don't have standing to challenge this regulation, who does?" The answer to that question may, in fact, be "no one." As the Supreme Court has noted, "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974). As we have previously observed, "[T]he entire concept of Article III standing rests on separation of powers...." *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 804 (D.C.Cir.1987); *see generally,* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 SUFFOLK U.L.REV. 881 (1983). "[S]tanding inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only in the last resort, and as a necessity...." *Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. at 3325 (citation omitted). Appellants have not demonstrated that they are affected in their individual capacities by the IRS's failure to prepare an EIS. Their arguments are based upon a number of highly speculative links in a chain of causation. Perhaps their claims are best heard by our sister branches of government.

Assuming for purposes of this opinion that the Ninth Circuit's reasoning in that decision was correct, it nonetheless does not support a conclusion that appellants have standing in the present case. The Ninth Circuit granted standing there, in the face of uncertainty regarding sites to be affected by development, because, *inter alia,* the uncertainty would be resolved by further government action, i.e., designation of development areas by the Forest Service. *Id.* at 1515–16 ("An added wrinkle in this case is the fact that the agency itself will have to take further action ... before authorizing site-specific development. Thus, not only is the risk contingent, it also is subject to future safeguards from the same agency and statutory source."). Here, in contrast, the IRS has completed its involvement in the case. The uncertainty in this case arises not from further government action, but from further action by independent third parties, farmers and manufacturers.